# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LORENZO BRELAND | ) | CIVIL ACTION NO. 15-2258 |
| Plaintiff, | ) | |
| vs. | ) | JUDGE ELDON E. FALLON |
| | ) | |
| ARENA FOOTBALL ONE, LLC., | ) | MAG. DANIEL E. KNOWLES, III |
| NEW ORLEANS VOODOO FOOTBALL | ) | |
| INC., and EVEREST NATIONAL | ) | |
| INSURANCE COMPANY     Defendants. | ) | JURY DEMAND |

## SECOND AMENDED COMPLAINT

Now into Court, comes Lorenzo Breland who amends his Complaint in this matter to read as follows:

### I. Preliminary Statement

1. This action seeks declaration of liability, medical monitoring and financial compensation for long-term chronic injuries, financial losses, expenses, and intangible losses suffered by the Plaintiff as a result of the Defendants' tortious misconduct including misrepresentation, fraud, negligence, and bad-faith breach of contract.

2. This action sets out to seek relief for the debilitating effects of mild traumatic brain injuries ("MTBI") caused by concussive and sub-concussive impacts that have afflicted the plaintiff, a former professional Arena Football player.

3. This action also arises from Arena Football One and Louisiana Arena Football's ("LAF") failure to take responsibility for payment of medical expenses incurred by the Plaintiff as a result of an injury he suffered during a game as a player.

## II. Introduction

## The League

4.  Arena football is a proprietary game almost identical to American football. The key differences are, however, as follows: it is played indoors on a 50-yard field surrounded by a waist high wall that serves as the boundary for the field, the teams play with 8 players on the field instead of 11, the field goal posts are much closer together than in traditional Football, and the ball used in arena football is slightly smaller. Having other slightly different rules, for all intents and purposes, the game is otherwise identical to traditional American football.

5.  The Arena Football League was created in 1987. In 2009, the league went bankrupt and all its assets were sold to Arena Football One, L.L.C. which was comprised of league officials and owners of Arena Football 2- the former AFL's subsidiary feeder-league. Arena Football One now operates under the name Arena Football League (and will be hereafter referred to as "AFL").

## Concussions in Sports

6.  In light of the recent NFL litigation that received nationwide attention, the close link between MTBI and long-term neurological problems in relation to many sports, especially football, has become almost common knowledge. However, the scientific community has warned of such dangers since long before the inception of the AFL:

    a.  In 1928, the first case of "Punch Drunk" in boxers was published in the *American Association Journal* by HS Martland;

b.  A 1937 article on "Dementia puglisistica" was published in the *US Navy Medical Bulletin;*

c.  A 1952 article on "Electroencephalographic changes in professional boxers was published in the *American Medical Association Journal;*

d.  A 1952 New England Journal of Medicine Article Vol. 246, pp. 554-556 talked about a three strike rule for concussions in 1945- three concussions and you should retire from football;

e.  A 1954 article on "Observations on the clinical and brain wave patterns of professional boxers" was published in the *American Medical Association Journal;*

f.  A 1956 article on "Diffuse degeneration of the cerebral white matter in severe dementia following head injury" was published in the *Neurological, Neurosurgery and Psychiatry Journal;*

g.  A 1957 article on the "Medical aspects of boxing, particularly from a neurological standpoint" was published in the *British Medical Journal;*

h.  A 1959 article on the "Observations of the pathology of insidious dementia following head injury" was published in the *Journal of Mental Science;*

i.  A 1966 article on "Concussion amnesia" in *Neurology;*

j.  A 1968 article on "Brains of Boxers" published in *Neurochirurgia;*

k.  A 1969 report by the Royal College of Physicians of London confirmed the danger of chronic brain damage occurring in boxers as a result of their careers;

l.  A 1969 article on "Organic Psychosyndromes due to boxing" in the *British Journal of Psychiatry;*

m.   A 1969 book on "Brain damage in boxers- A study of the prevalence of traumatic encephalopathy among ex-professional boxers" by AH Roberts;

n.   A 1970 article on "retrograde memory immediately after concussion" published in the *Lancet;*

o.   In 1973, a disabling and sometimes deadly condition involving the second impact concussion occurring before symptoms of a first concussion was described by R.C. Schneider. This later was coined the Second Impact Syndrome in 1984;

p.   A 1973 article on "the aftermath of boxing" published in *Psychology Medicine;*

q.   JA Corsellis, CJ Bruton, D Freeman-Browne, *The Aftermath of Boxing,* 3 Psych. Med. 270-303 (1973);

r.   A 1974 article on "Cerebral concussion and traumatic unconsciousness, Correlation of experimental and clinical observations of blunt head injuries" published in *Brain;*

s.   A 1974 article on "Traumatic encephalopathy in a young boxer" published in the *Lancet;*

t.   A 1974 article on "Delayed recovery after mild head injury" was published in the *Lancet;*

u.   J.A. Corsellis, *Brain Damage in Sport*, 1 LANCET 401, 401 (1976) (finding that the brain tissue of fifteen former boxers who sustained multiple head trauma evidenced neuropathological signs of Chronic Traumatic Encephalopathy);

v.   A 1978 article on "Posttraumatic dementia" published in *Aging;*

w.   J.C. Maroon, P.B. Steele, R. Berlin, *Football Head & Neck Injuries- An Update*, 27 Clin. Neurosurg. 414-29 (1980).

x.  A 1981 article on "Association football injuries to the brain: a preliminary report" published in the *British Journal of Sports Medicine;*

y.  H Hugenholtz, MT Richard, *Return to Athletic Competition Following Concussion,* 127(9) Can. Med. Assoc. J. 827-29 (1982);

z.  JA Corsellis, *Boxing and the Brain,* 298 BMJ 105-109 (1989);

aa.  James P. Kelly et al., *Concussion in Sports, Guidelines for the Prevention of Catastrophic Outcome,* 266 JAMA 2868 (1991);

bb.  B.E. Leininger & J.S. Kreutzer, *Neuropsychological Outcome of Adults with Mild Traumatic Brain Injury: Implications for Clinical Practice and Research, in* REHABILITATION OF POST-CONCUSSIVE DISORDERS (L.J. Horn & N.D. Zasler eds., State of the Art Reviews, Physical Medicine and Rehabilitation, Hanley and Belfus, Inc. 1992);

cc.  RC Cantu, *Cerebral Concussion in Sports,* 14(1) Sports Med. 64-74 (1992);

dd.  RC Cantu, RO Mueller, *Catastrophic Football Injuries in the USA,* 2(3) Clin. J. Sports Med. 180-85 (1992); and

ee.  Mild Traumatic Brain Injury Committee of the Head Injury Interdisciplinary Special Interest Group of the American Congress of Rehabilitation Medicine, *Definition of Mild Traumatic Injury,* 8 J. HEAD TRAUMA REHABIL. 86-7 (1993).

7.  Arena football is unquestionably an aggressive and violent sport with physical injuries being common. As such, it is vital to the safety of the players that the AFL act reasonably, through research studies and other means to identify the risks associated with playing professional football, to keep the teams and players informed of the risks that they identify, and to take responsible steps based upon their findings to protect players.

8.    The Defendants have known or should have known for many years that the American

Association of Neurological Surgeons (the "AANS") has defined a concussion as "a

clinical syndrome characterized by an immediate and transient alteration in brain function,

including an alteration of mental status and level of consciousness, resulting from

mechanical force or trauma." The AANS defines traumatic brain injury (TBI) as:

> a blow or jolt to the head, or a penetrating head injury that disrupts
> the normal function of the brain. TBI can result when the head
> suddenly and violently hits an object, or when an object pierces the
> skull and enters the brain tissue. Symptoms of a TBI can be mild,
> moderate, or sever, depending on the extent of damage to the brain.
> Mild cases may result in a brief change in mental state or
> consciousness, while sever cases may result in extended periods of
> unconsciousness, coma or even death.

9.    The Defendants have known or should have known for many years that MTBI generally

occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly.

The results frequently include, among other things, confusion, blurred vision, memory loss,

nausea, and sometimes unconsciousness.

10.    The Defendants have known or should have known for many years that medical evidence

has shown that symptoms of MTBI can appear hours or days after the injury, indicating

that the injured party has not healed from the initial blow.

11.    The Defendants have known or should have known for many years that once a person

suffers an MTBI, he is up to four times more likely to sustain a second one. Additionally,

after suffering even a single sub-concussive blow, a lesser blow may cause MTBI, and the

injured person requires more time to recover. This goes to the heart of the problem: players

being unaware of the serious risk posed to their long-term neuro-cognitive health.

12.    The Defendants have known or should have known for many years that the clinical and

neuro-pathological studies by some of the nation's foremost experts demonstrate that

multiple head injuries or concussions sustained during a football player's career can cause severe neuro-cognitive problems such as depression and early-onset of dementia.

13. The Defendants have known or should have known for many years that published peer reviewed scientific studies have shown that repeated traumatic head impacts (including sub concussive and concussive blows) cause ongoing and latent brain injury. These injuries have been documented and associated with sports-related head impacts in both football and boxing.

14. The Defendants have known or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players, including former NFL players, have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early-onset of Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE"). The latter condition involves the slow build-up of the Tau protein within the brain tissue that causes diminished brain function, progressive cognitive decline, and many of the symptoms listed above. CTE is also is associated with an increased risk of suicide.

15. The Defendants have known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Published papers have shown that this condition is prevalent in retired professional football players who have a history of head injury. The changes in the brain caused by repetitive trauma are thought to begin when the brain is subjected to that repetitive trauma, but

symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of active athletic involvement.

16. The Defendants have known or should have known for many years of the reported papers and studies documenting autopsies on over twenty-five former NFL players. The papers and studies show that over ninety percent of the players suffered from CTE. NFL players do not differ from AFL players in any material respect.

17. As a result, published peer reviewed scientific studies have shown that concussive and sub-concussive head impacts while playing professional football are linked to significant risk for permanent brain injury.

18. Published peer reviewed scientific studies have shown that 28% of the professional football retirees studied suffered from depression, whereas the prevalence of depression in the general population is 9.5%.

19. Published peer reviewed scientific studies have shown that 36% of professional football retirees, age 65-75, who were studied suffered from dementia, whereas the prevalence of dementia in the general population for the same age group is merely 2.2-6.5%.

20. Published peer reviewed scientific studies have shown that retired players with three or more reported concussions had a fivefold prevalence of mild cognitive impairment (MCI) and a threefold prevalence of significant memory problems, compared to other retirees.

**<u>How the League has Handled this Problem</u>**

21. Despite this mountain of evidence illustrating the long-term risks associated with severe blows to the head that has been available for years, the AFL took no remedial action to prevent its players from unnecessary harm until June of 2014 when it adopted acceleration

and impact sensors into its helmets. This program was designed to put the AFL at the forefront of concussion research and safety.

22.    The AFL, a league that faced bankruptcy just years ago and only has a fraction of the popularity and revenue of the NFL, has cut corners in a multitude of ways in an attempt to maintain a profitable league with such a small fan-base. These shortcuts seem to be at the expense of its players' health and welfare.

23.    Ever since the miraculous rise of Kurt Warner from AFL sensation to NFL stardom, the league has taken advantage of hopeful athletes seeking a second shot at a more prestigious career. These second-chance professionals make, on average, just around $8,000 a year compared to the multi-million-dollar salaries of NFL players. This salary is supplemented with housing for the 20 week season and various gift cards to local restaurants. The players are, however, promised top-of-the-line medical care free of charge for all injuries incurred during gameplay. However, this promise appears to be completely broken and dishonored by the Defendants.

24.    Furthermore, the AFL has fostered an environment of violence and brutality for the sake of entertainment. This, coupled with the astonishingly low pay and fictional medical care, has fashioned the AFL players into modern-day gladiators who are sent to break each others' backs[1] in astroturfed coliseums while the executives sit back and cash checks on their behalf. And finally, while these players are recruited to play this violent sport for almost no pay, the moment they're injured, for a mere $8,000, the league abandons them as it is cheaper to replace an injured player than pay for his treatment- whether it is short, medium or long-term.

---

[1] Rhetorically speaking

25.    Furthermore, the rules of the AFL, as modified from traditional American football, serve to create an even more dangerous set of circumstances for the players. First, the field is significantly smaller which creates a heightened chance for contact. Second, the requirement of a perimeter wall that serves as the boundary for the field creates an unnecessary hazard. Players are often blocked and tackled into the wall. Such behavior is considered part of the game. The wall is padded, but is by no means safe and plays a significant role in game related injuries including but not limited to concussive hits. These added risks create a heightened duty to protect players separate and above those from the duties expected of the NFL.

26.    The AFL has established itself as supervisor for the health and safety of its players by creating regulations concerning what types of equipment are required and designating certain gear as illegal and even, recently (June 2014), partnered with Brian Sentry, a leading innovator in the field of wearable sensors, to require acceleration and impact sensors in all AFL helmets. Yet, the teams should also bear joint and severed responsibility.

27.    Being the first sports league to require concussion sensors in June of last year (which was almost certainly a reaction to the NFL litigation because the technology has been available since at least 2006), the AFL has placed itself at the forefront of the concussions-in-sports discussion. In March of this year, the AFL commissioner, Scott Butera, said that the league's partnership with Brian Sentry allows it to be "on the cutting edge of concussion research, protocol, and management."[2]  The act, furthermore, marks the league's acknowledgement of the responsibility it owes its players to ensure their safety and protect

---

[2]AFL Extends Partnership with Brian Sentry (March 11, 2015), http://www.arenafootball.com/sports/a-footbl/spec-rel/031115aac.html (last visited June 19, 2015).

them from concussive injuries. However, for Breland and potentially many others, this

action is too little too late. One may not wash his hands of his past wrongs simply by

seeking to prevent future ones.

### III. Jurisdiction and Venue

28. Federal Jurisdiction is authorized under 28 U.S.C. §1332. The Plaintiff is a citizen of

Mississippi and the Defendant AFL is an Illinois corp. with its principal place of business

in Illinois, Defendant Louisiana Arena Football ("LAF") is a Louisiana L.L.C. with its

principle place of business in Louisiana. The damages in question excluding costs and fees

exceed $75,000.

29. This Court has personal jurisdiction over the AFL because it does business in the state of

Louisiana, operates a franchise, the New Orleans Voodoo, in this district, and derives

substantial revenue from its contacts with Louisiana.

30. Venue is proper pursuant to 28 U.S.C. §1391(b)(1) because Defendants are entities with

the capacity to sue and be sued under their common name and reside, as that term is

defined at 28 U.S.C. §1391(c)(2) and (d), in this District where they operate a franchise.

### IV. Parties

31. Plaintiff, Lorenzo Breland, is a resident of Mississippi. Plaintiff was an employee of the

Defendant, New Orleans Voodoo (LAF).

32. Defendant, Arena Football League One, L.L.C. is an Illinois corporation with its principal

place of business in Chicago, Illinois.

33. Defendant, Louisiana Arena Football L.L.C. is a Louisiana LLC that owned the New

Orleans Voodoo franchise during all times relevant to this complaint with its principal

place of business in LA.

34. Defendants AFL and LAC will be referred to as "Defendants" in paragraphs addressing both organizations.

35. Defendant, EVEREST NATIONAL INSURANCE COMPANY (hereinafter "EVEREST"), a foreign insurance carrier licensed to do and is doing business within the State of Louisiana, and providing insurance coverage to the defendants for all endeavors of the AFL and LAC around the country, and worldwide.

## V. Statement of Facts

36. Plaintiff was employed by defendant, LAF as a player from 2010-2014.

37. In 2011, while playing for the Tulsa Talons, Plaintiff suffered a concussion during a game. He briefly saw the team doctor and was diagnosed with a concussion. The team encouraged him to resume play as quickly as possible and he started in the very next game.

38. In the third game of the 2014 season, on April 11, 2014, playing for the New Orleans Voodoo, Plaintiff sustained a severe blow to the head causing a concussion.

39. Plaintiff was taken from the game to a hospital where he received limited medical attention.

40. Plaintiff was forced to walk to a bus from the hospital after his initial visit for the concussion.

41. Plaintiff was urged by New Orleans Voodoo to return to play as quickly as possible.

42. When the team tried to reinstate him, plaintiff complained to his coach that he did not feel healthy and was not ready to play. He was sent to a speech pathologist.

43. The concussion had caused significant head injuries that rendered the plaintiff bedridden for approximately 6 weeks.

44. Plaintiff was first placed on the inactive roster where his salary was cut by almost 2/3.

45.   Plaintiff never received results from his session with the speech pathologist.

46.   Plaintiff was then asked to take an exit physical.

47.   Upon questioning why he needed an exit physical, plaintiff was suspended from the league.

48.   The defendant LAF then cut plaintiff from its team.

49.   Plaintiff's second AFL concussion ended his career. The AFL and LAF essentially abandoned the Plaintiff from the moment it became apparent that his injury rendered him unable to play immediately.

50.   Defendants chose not to pay for his medical care and assist him in rehabilitation so he could resume play in a healthy manner.

51.   Defendants AFL and New Orleans Voodoo have refused to pay any of plaintiff's medical bills.

52.   Plaintiff has paid some of these medical bills but is struggling to do so on a high-school teacher's salary and should never have been responsible for them in the first place.

53.   Medical expenses are explicitly covered in the Collective Bargaining Agreement (attached hereto as exhibit A). Furthermore, plaintiff alleges that, while playing for the Voodoo, he was told he would receive "the same medical care as the Saints." (Referring to the NFL team). This representation proved false.

54.   Plaintiff continues to suffer from long-term residual effects of the concussion including but not limited to: dizziness, loss of memory, headaches/ migraines, neck aches, exhaustion, weight loss, and fatigue.

55.   A full recovery is now unlikely, and the full effects of the injuries are still unclear.

56.   Plaintiff alleges that the AFL was aware of the risks for long term brain damage resulting from concussions but failed to provide adequate warning, education, or safety protocols.

57.   Plaintiff alleges that the AFL abandoned him the moment his injury made it apparent he was an unmarketable product for them.

58.   Further, Plaintiff contends that the AFL fostered an environment of brutality and violence in hopes of high profits and entertainment value with little care for the well-being of its players- a motivation that resulted in his injury.

59.   Defendant, EVEREST, provided a commercial general liability insurance policy to all defendants.   Upon information and belief, this policy may inure to provide benefits or coverage to all defendants.

## VI. Claim Particulars

The particulars of Plaintiff's claims against each defendant are as follows:

### Count I
### Declaratory Relief- Liability

60.   Plaintiff adopts by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

61.   There is a case and controversy among Plaintiff on the one hand and the Defendants on the other.

62.   Pursuant to 28 U.S.C. §2201, Plaintiff seeks a declaration as to the following:

    a.   that the Defendants knew or should have known, at all times material, that the repeated, traumatic and unnecessary head impacts the Plaintiff endured while playing Arena Football were likely to expose him to neuro-degenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease or similar cognitive-impairing conditions;

    b.   that based on the Defendants' voluntary undertaking to research concussions, it acknowledged this duty to advise Plaintiff of that heightened risk;

c.     that the Defendants willfully and intentionally concealed from and mislead the

   Plaintiff concerning that risk; and

d.     that the Defendants recklessly endangered the Plaintiff.


**Count II**
**Medical Monitoring**

61.   Plaintiff adopts by reference all allegations contained in the paragraphs above, as if fully

   set forth in this Count.

62.   Plaintiff has experienced multiple traumatic brain impacts during his AFL career that

   significantly increased his risk of developing neuro-degenerative disorders and diseases,

   including but not limited to CTE, Alzheimer's disease, and other similar cognitive

   impairing conditions.

63.   Repetitive brain injuries during AFL practices and games have a microscopic and latent

   effect on the brain. Repetitive exposure to accelerations to the head causes deformation,

   twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take

   place, including the release of small amounts of chemicals within the brain, such as the Tau

   protein. Among other things, the gradual build-up of Tau- sometimes over decades- causes

   CTE, which is the same phenomenon as boxer's encephalopathy (or "punch drunk

   syndrome") studied and reported by Harrison Martland in 1928.

64.   The game of arena football as played in the AFL, including both practices and game play,

   has exposed the plaintiff to hazardous conditions and out-of-the-ordinary risks of harm.

   These repetitive head accelerations to which the Plaintiff has been exposed present risks of

   latent but long-term debilitating chronic illness not present to the normal population.

Absent Defendant's negligence, concealment, fraud, and/or misrepresentation, Plaintiff's exposure to the risks of harm as described above (including but not limited to) the release of biological substances into his brain would have been materially lower.

65. Accordingly, the repetitive head impacts sustained by AFL players in games and practices exposed them, including the Plaintiff, to subtle and repetitive changes within the brain on the cellular level. For that reason, the environment within which the Plaintiff has sustained repetitive head impacts exposed him to substantial hazards.

66. Depending on many factors, including the amount of the exposure to repetitive head impacts and the release of Tau protein, the player/victim will develop a range of subtle to significant neuro-cognitive changes over time.

67. The latent injuries which develop over time and manifest later in life include but are not limited varying forms of neuro-cognitive disability, decline, personality change, mood swings, rage, and sometimes fully developed encephalopathy.

68. Like the organizers of the NFL, because of the violent nature of the game of football and by extension arena football, the Defendants were fully aware of the danger of exposing all AFL players to concussive and sub-concussive head impacts during games and practices.

69. As a proximate result of the Defendants' tortious conduct, Plaintiff has experienced an increased risk of developing serious latent neuro-degenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and/or other similar cognitive impairing conditions.

70. The latent brain injuries from which Plaintiff suffers require specialized testing (with resultant treatment) that is not generally given to the public at large.

71.   The available monitoring regime is specific for individuals exposed to repetitive head

trauma and is different from that normally recommended in the absence of exposure to this

risk of harm.

72.   The medical monitoring regime includes but is not limited to: baseline tests and diagnostic

examinations that will assist in diagnosing the adverse health effects associated with arena

football-related MBTI. These diagnoses will facilitate the treatment and behavioral and/or

pharmaceutical interventions that will prevent or mitigate various adverse consequences of

the latent neurodegenerative disorders and diseases associated with the repetitive sub-

concussive and concussive injury that Plaintiff experienced in the AFL.

73.   The available monitoring regime is reasonably necessary according to contemporary

scientific principles within the medical community specializing in the diagnosis of head

injuries and their potential link to, *inter alia*, memory loss, impulse rage, depression, early

onset dementia, CTE, Alzheimer- like syndromes, and similar cognitive impairing

conditions.

74.   By monitoring and testing the Plaintiff, the risk that the Plaintiff will suffer long-term

injuries, disease, and losses will be significantly reduced.

75.   Plaintiff, therefore, seeks an injunction creating a Court-supervised, medical monitoring

program, funded by the Defendants, which will facilitate the diagnosis and adequate

treatment of Plaintiff for neuro-degenerative disorder or disease. The medical monitoring

should include a trust fund to pay for the medical monitoring and treatment of the Plaintiff

as frequently and appropriately as necessary.

76.   Plaintiff has no adequate remedy at law in that monetary damages alone cannot

compensate him for the continued risk of developing long-term physical and economic

losses due to concussive injuries. Without Court-approved medical monitoring as described herein, or established by the Court, Plaintiff will continue to face an unreasonable risk of continued injury and disability.

**Count III**
**Fraudulent Misrepresentation by Concealment**

77.   Plaintiff adopts by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

78.   The Defendants knew that repetitive head impacts in games and practices created an unreasonable risk of harm to AFL players that was similar or identical to the risk of harm, for example, boxers who receive repetitive impacts to the head during practices and matches.

79.   The Defendants have been aware of and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long term brain injury associated with repetitive traumatic impacts to the head to which AFL players are exposed.

80.   During that time, the Defendants knowingly and fraudulently concealed the then current AFL player's risk of head injuries in AFL games and practices.

81.   Given the Defendants' superior and unique vantage point, Plaintiff reasonably looked to them for guidance on head injuries and concussions.

82.   The Defendants failed to publish a report or take any action regarding its playing rules or medical protocols, all of which concealed and minimized the risks of repetitive brain impacts.

83.   During the relevant time period, the Defendants knew or should have known that the plaintiff would reasonably rely on their omissions and/or silence on the health issue.

84.  The Defendants, therefore, concealed material facts and information and delayed revealing material medical information with the intent to deceive and defraud, which caused Plaintiff to become exposed to the harm referenced above. The Defendants' concerted concealment of the risks to which the players had been exposed on the field delayed his ability to plan for the future of himself and to seek appropriate treatment of his latent neurodegenerative conditions.

85.  The Defendants knew and expected that the Plaintiff would rely on its silence and Plaintiff in fact did reasonably rely on the silence of the AFL during his career.

86.  The Defendants' actions and/or omissions were committed willfully, maliciously, and with reckless disregard of the player's well-being and legal rights.

87.  As a direct and proximate result of the Defendants' fraudulent conduct, Plaintiff has suffered physical injury, including but not limited to existing and latent cognitive conditions that create memory loss, diminished cognitive function, non-economic losses, and economic losses.

88.  As a direct and proximate result of the Defendants' willful concealment, Plaintiff has suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

89.  As a result of the Defendants' misconduct as alleged herein, the Defendants are liable to Plaintiff for, and Plaintiff seeks, the full measure of damages allowed under applicable law.

**Count IV**
**Fraudulent Misrepresentation by Nondisclosure**

90.  Plaintiff adopts by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

91. The Defendants knew that repetitive head impacts in games and practices created an unreasonable risk of harm to AFL players that was similar or identical to the risk of harm, for example, boxers who receive repetitive impacts to the head during practices and matches.

92.  The Defendants have been aware of and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long term brain injury associated with repetitive traumatic impacts to the head to which AFL players are exposed.

93. During that time period, the plaintiff did not know these facts. The Defendants knew that the players were unaware of these facts, knew that the players would reasonably expect to be told these facts, knew that not disclosing these facts could justifiably induce the players to unreasonably expose themselves to head injuries in AFL games and practices, and intended to deceive the players.

94. Given the Defendants' superior and unique vantage point, Plaintiff reasonably looked to them for guidance on head injuries and concussions.

95. The Defendants failed to publish a report or take any action regarding its playing rules or medical protocols, all of which concealed and minimized the risks of repetitive brain impacts.

96. The Defendants knew or should have known that the plaintiff would reasonably rely on their omissions and/or silence on the health issue.

97. The Defendants, therefore, withheld or omitted material facts and information and delayed revealing material medical information with the intent to deceive and defraud, which caused Plaintiff to become exposed to the harm referenced above. The Defendants'

concerted omission of the risks to which the players had been exposed on the field delayed his ability to plan for the future of himself and to seek appropriate treatment of his latent neurodegenerative conditions.

98.   The Defendants knew and expected that Plaintiff would rely on its silence, and Plaintiffs in fact did reasonably rely on the silence of the Defendants during and after his career.

99.   The Defendants' actions and/or omissions were committed willfully, maliciously, with intent to injure and damage the Plaintiff, and with reckless disregard of the Plaintiff's legal rights.

100.  As a direct and proximate result of the Defendants' fraudulent conduct, Plaintiff has suffered physical injury, including but not limited to existing and latent cognitive conditions that create memory loss, diminished cognitive function, non-economic losses, and economic losses.

101.  As a direct and proximate result of the Defendants' fraudulent conduct, Plaintiff has suffered physical injury, including but not limited to existing and latent cognitive conditions that create memory loss, diminished cognitive function, non-economic losses, and economic losses.

102.  As a direct and proximate result of the Defendants' nondisclosure, Plaintiff has suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

103.  As a result of the Defendants' misconduct as alleged herein, the Defendants are liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

**Count V**
**Fraud**

104. Plaintiff adopts by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

105. The Defendants knew or should have known that repetitive head impacts in football games and full-contact practices created a risk of harm to AFL players that was similar or identical to the risk of harm to boxers who receive the same or similar repetitive impacts to the head during boxing practices and matches.

106. The Defendants knew that the risks of brain injury could be reduced by implementing changes to the game, including but not limited to: (a) eliminating the wall as a boundary to the field; (b) the active monitoring of players for signs of MTBI; (c) banning conduct which results in concussive hits, sub-concussive events and/or brain injuries including but not limited to leading with the head, helmet to helmet contact.

107. The Defendants, however, withheld the information it knew about the risks of head injuries in the game from then-current AFL players and former AFL players and ignored the known risks to all AFL players.

108. The Defendants deliberately delayed implementing changes to the game and employing proper personnel to minimize the risks of head injuries because such changes would be expensive and reduce its profitability.

109. The Defendants have or should have been aware of and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which AFL players are exposed.

110. The Defendants did not timely reveal the information it knew or should have known from medical knowledge available for decades and failed to act, with the exception of the newly added acceleration sensors implemented in 2014.

111. Given the Defendants' superior and unique vantage point, Plaintiff reasonably looked to the AFL for guidance on head injuries and concussions.

112. During the time, the Defendants knowingly and fraudulently concealed from the plaintiff the risks of head injuries in AFL games and practices.

113. The Defendants, however, withheld this information from the AFL players and ignored the known risks to all AFL players.

114. During his playing days and after his retirement, the Plaintiff justifiably and reasonably relied on the Defendants' omissions and failure to act to his detriment.

115. The Plaintiff was damaged by the Defendants' misconduct. He has suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

116. As a result of the Defendants' fraud, the AFL is liable to Plaintiff for, and Plaintiff seeks, the full measure of damages allowed under applicable law, including punitive damages where appropriate.

**Count VI**
**Negligent Misrepresentation**

117. Plaintiff adopts by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

118. A special relationship exists between the Defendant, AFL, and the Plaintiff sufficient to impose a duty on the Defendant to disclose accurate information to the Plaintiff concerning potential long-term risks associated with reasonably foreseeable injuries.

119. The Defendant, AFL, long knew or should have known that repetitive head impacts in AFL games and practices created a risk of harm to AFL players that was similar or identical to the risk of harm to boxers who receive repetitive impacts to the head during boxing practices and matches and NFL players during games and practices.

120. The Defendant, AFL, was or should have been aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of repetitive traumatic impacts to the head to which AFL players were exposed.

121. The Defendant, AFL, however, withheld this information from AFL players and ignored the risks to AFL players.

122. The Defendant, AFL, therefore misrepresented the dangers the Plaintiff faced in participating in arena football.

123. Plaintiff justifiably relied on the Defendant, AFL's, silence and refusal to act in believing that the long-term risks of permanent harm from playing professional arena football were minimal or non-existent.

124. Plaintiff's reliance on the Defendant, AFL, was reasonable, given their superior and unique vantage point on these issues.

125. The Defendant, AFL's, silence and its refusal to change any of the rules of play supported the misrepresentations that concussions and long term medical harm resulting from them were not a serious issue for arena football players and that the plaintiff was not at an increased risk of short-term and long-term adverse consequences.

126. The Defendant, AFL, made these misrepresentations and actively concealed true information at a time when it knew, or should have known, because of its superior position

of knowledge, that the Plaintiff faced serious health problems from concussive and sub-concussive hits.

127. The Defendant, AFL, knew or should have known the misleading nature of its silence and refusal to act when they decided to do nothing.

128. The Defendant, AFL, made the misrepresentations and actively concealed information knowing that the Plaintiff would and did rely on the misrepresentations or omissions in, among other things, how the Plaintiff addressed the concussive and sub-concussive injuries he sustained.

129. As a direct and proximate result of the Defendant, AFL's, negligent misrepresentations, Plaintiff has suffered and continues to suffer serious personal injury, including neuro-cognitive brain disease associated damages including mental disability, loss of income, pain and suffering, and emotional distress.

130. As a result of the Defendant, AFL's, misconduct, they are liable to the Plaintiff for, and Plaintiff seeks, the full measure of damages allowed under applicable law.

**Count VII**
**Negligence**

131. Plaintiff adopts by reference all allegations contained in the paragraphs above, as if fully set forth in this Count.

132. The Defendant, AFL, voluntarily assumed a duty to provide a reasonably-safe playing and practice environment for Plaintiffs.

133. The Defendant, AFL's, failure to adequately address the continuing health risks associated with concussive events, sub-concussive events and/or brain injuries that AFL players sustained since the leagues inception constituted a breach of its duty to these players,

which has resulted in long-term neuro-cognitive problems and disabilities to former AFL players, including the Plaintiff.

134. The failure of the Defendant, AFL, to publicize within the League, to active players, the mounting evidence in the scientific literature of the evolving and chronic neuro-cognitive problems amongst former football players caused then-current and retired players to believe their physical and psychological problems (as described herein) were neither serious nor related to football. These acts and/or omissions caused the Plaintiff to ignore the need for necessary treatment. Likewise, these omissions and commissions had the institutional effect of reducing the interest in helmet safety research, avoiding changes in rule-playing to minimize head injury, avoiding the need to promulgate rules affecting the return to play rules when concussive events are detected, and establishing programs to educate players about the risks of sub-concussive and concussive long-term risk to their health.

135. The foregoing behavior of the Defendant, AFL, proximately caused the Plaintiff's injuries and/or damages.

136. The Plaintiff has sustained serious injuries and damages as a result of the Defendant's negligence.

137. As a result of the Defendant's negligence, it is liable to Plaintiff for, and Plaintiff seeks, the full measure of damages allowed under applicable law.

**Count VIII**
**Breach of Contract in Bad Faith**

138. Through the collective bargaining agreement signed by the Plaintiff and the League, the Defendants owed a duty to cover all medical expenses resulting from an injury sustained in the act of playing in an AFL game.

139.  The Plaintiff was injured during an AFL game and incurred substantial medical expenses as a result of that injury.

140.  Defendants have failed to pay for any medical expenses related to the concussion Plaintiff received in his last game as an AFL player.

141.  This is a bargained-for duty, governed by the collective bargaining agreement and may not be waived by any inaction of the Plaintiff.

142.  Plaintiff sought relief from the AFL for his medical expenses and the AFL refused to pay them. The breach is therefore intentional and in bad faith.

143.  The Defendants is therefore liable to the Plaintiff for all medical expenses incurred and all costs of this litigation including attorney's fees.

144.  Plaintiff seeks damages in the form of past, present, and future medical expenses relating to the concussion he received as an AFL player, costs of this litigation, and reasonable attorney's fees.

145.  Plaintiff seeks all damages, forms of relief, and otherwise against all defendants, including EVEREST which provided an insurance policy to cover defendants, jointly, for all actions, damages, and otherwise herein alleged.

146.  Plaintiff also seeks all forms of insurance penalties, bad faith damages, general damages, and attorney's fees against Defendant, EVEREST, as allowed under La.R.S. 22:1892 and 22:1973 and related statutes. In particular, defendant EVEREST committed misrepresentation in wrongfully conveying both policy and non-policy facts to Lorenzo Breland and his representatives about the extent of its insurance coverage.  Upon confirming coverage for the injuries and allegations contained in this matter, EVEREST than knowingly

and without notice to plaintiff or plaintiff counsel, filed a Declaratory Judgment to nullify coverage despite its prior contentions confirming coverage.

**Prayer for Relief**

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A. Declaratory Relief requested pursuant to 28 USC §2201 against the AFL.

B. Grant an injunction and/or other equitable relief against the AFL and/or LAF and in favor of the Plaintiff for the requested medical monitoring.

C. Award plaintiff compensatory damages for his past and current medical bills related to the injury; as well as all future medical care that may be needed.

D. Award plaintiff compensatory damages for pain and suffering in an amount to be determined at trial.

E. Award plaintiff appropriate punitive damages in an amount to be determined at trial.

F. Award Plaintiff such other relief as may be appropriate; and

G. Award plaintiff reasonable attorney's fees, together with the costs of this action and all such other and further legal equitable relief related to this action to which he may be entitled.

H. Grant an injunction and/or equitable relief against EVEREST holding that its insurance policy, conditions, terms, and otherwise provide insurance coverage for the injuries and claims asserted by Lorenzo Breland in the instant matter and also holding EVEREST in bad faith under La.R.S. 22:1892 and 22:1973.

## Jury Demanded

Plaintiff hereby demands a trial by jury on all matter so triable.

Respectfully Submitted,

__/s/ Galen M. Hair_____
Galen M. Hair, La. Bar No. 32865, T.A.
Andrew K. Jacoby, La. Bar No. 32512
**Varadi, Hair & Checki, LLC**
650 Poydras Street, Suite 1550
New Orleans, Louisiana 70130
Telephone: (504) 684-5200
Facsimile: (504) 613-6351
hair@vhclaw.com
jacoby@vhclaw.com

-and-

Joseph (Joey) LaHatte, III, La. Bar No. 31224
LaHatte Law Firm, LLC
4405 Zenith Street
Metairie, Louisiana 70001
Telephone: (504) 309-2996
Facsimile: (855) 733-8180
joey@lahattelaw.com
*Counsel for Lorenzo Breland*

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of May, 2016, I electronically transmitted the

attached document to the Clerk of the Court using the ECF system for filing and transmittal of

Notice of Electronic Filing.

__/s/ Joseph F. LaHatte III_____